IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **GREGER PACIFIC MARINE, INC.**, <br><br> Plaintiff, <br><br> v. <br><br> **OREGON OFFSHORE TOWING, INC.**, <br><br> Defendant. | Case No. 3:13-cv-00461-SI <br><br> **OPINION AND ORDER** |

Michael E. Haglund and Michael K. Kelley, HAGLUND KELLEY LLP, 200 S.W. Market Street, Suite 1777, Portland, OR 97201. Of Attorneys for Plaintiff.

Michael G. Hanlon, LAW OFFICES OF MICHAEL G. HANLON, 101 S.W. Main Street, Suite 825, Portland, OR 97204; Robert A. Green, LAW OFFICES OF ROBERT A. GREEN, INC., P.S., 1900 West Nickerson Street, Fishermen's Center, Suite 203, Seattle, WA 98119. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

In this admiralty case, Plaintiff, Greger Pacific Marine, Inc. ("Greger Pacific"), seeks to recover for the loss of two barges that sank while being towed by Defendant, Oregon Offshore Towing, Inc. ("Oregon Offshore"), from Pearl Harbor, Hawaii to San Francisco, California. Greger Pacific claims that the two barges (known as "the Weeks 243" and "the DB-560") sank as a result of Oregon Offshore's gross negligence. Oregon Offshore asserts two counterclaims, breach of contract and breach of warranty, seeking to recover $132,500 under the parties' charter

PAGE 1 – OPINION AND ORDER

towing agreement. Oregon Offshore moves for summary judgment, arguing: (1) both barges were unseaworthy as a matter of law, thereby relieving Oregon Offshore from any liability to Greger Pacific; (2) Greger Pacific was not the owner of the Weeks 243 barge at the time of loss and thus may not assert a claim for the loss of that barge; and (3) Oregon Offshore is entitled under its contract with Greger Pacific to be paid the agreed-upon towage fee that became "irrevocably" due upon the commencement of the tow. For the reasons that follow, Oregon Offshore's motion for summary judgment is DENIED on all three grounds.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND[1]

Greger Pacific is a California corporation that provides ocean towing, tow rigging, and harbor tug and barge services to the maritime industry along the West Coast. Ronald Greger is the founder and Vice President of Greger Pacific. Oregon Offshore is an Oregon corporation that owns and operates tugboats and tows barges for hire. Jerry White is the President of Oregon Offshore and is responsible for its operations.

In May 2011, Greger Pacific purchased the DB-560, a 120-foot inland derrick barge built in 1944, from a seller in Hawaii. Greger Pacific paid $80,000 for the DB-560. In July 2012, a company affiliated with Mr. Greger purchased the Weeks 243, a 175-foot flat deck inland crane barge built in 1962, also from a seller in Hawaii.[2] Greger Pacific paid $1 plus "other valuable consideration" for the Weeks 243.

Greger Pacific wanted to transport both barges from Hawaii to San Francisco. Before purchasing the Weeks 243, Mr. Greger hired Dana Teicheira, a maritime surveyor with more than 30 years of experience in the maritime industry, to perform a "condition and valuation" survey of both barges. In his survey, Mr. Teicheira recommended that some repairs be made to both barges. Mr. Teicheira also has submitted a declaration in this action, opining that he believed the DB-560 was "in adequate condition to be towed from Honolulu to San Francisco."[3] Teicheira Decl. ¶ 19. Regarding the DB-560 specifically, Mr. Teicheira reported in his survey

---

[1] The facts are presented in the light most favorable to the non-moving party.

[2] According to Mr. Greger, he purchased the Weeks 243 through Greger Pacific Equipment, Inc., ("Greger Equipment"), which is another company that he founded. Mr. Greger states that Greger Equipment was dissolved in late 2012, and it transferred all of its assets, including its claims against Oregon Offshore, to Plaintiff, Greger Pacific.

[3] Mr. Teicheira makes no statement in his declaration, however, about the seaworthiness of the Weeks 243.

PAGE 3 – OPINION AND ORDER

that there were "heavy indentations to the deck," and he recommend that Greger Pacific "seal the holes watertight, and then apply 4" to 6" thick asphalt or concrete wear." *Id.* In his declaration, Mr. Teicheira explains that he did not actually discover any "holes" that needed to be filled and that the "indentations," which he did recommend be filled, did not affect the barge's watertight integrity. *Id.*

In addition to Mr. Teicheira's statements about the seaworthiness of the DB-560, Mr. Greger submitted his own declaration opining about the seaworthiness of both barges. Mr. Greger states that he personally examined both barges before the towing commenced and, after applying marine plywood cover to two open hatches on the deck of the DB-560, he believed that both barges were seaworthy for the Hawaii to San Francisco transit. Greger Decl. ¶ 9.

In August 2012, Greger Pacific and Oregon Offshore entered into a written towing agreement for Oregon Offshore to tow the two barges in tandem from Hawaii to California. Oregon Offshore sent its standard form towage contract (the "Towage Agreement") to Greger Pacific, and on August 18, 2012, Greger Pacific returned the signed Towage Agreement by email.

Both the Towage Agreement and federal regulations required that Greger Pacific tender the barges for tow in "seaworthy condition," meaning fit for sea travel. The Coast Guard also required that a barge that will be towed from Hawaii to the continental United States obtain a load line certificate (or a trip permit or exemption letter), which is intended to ensure the overall seaworthiness of the vessel. *See* U.S. COAST GUARD, LOAD LINE POLICY NOTES § 1 (2008), available at http://www.uscg.mil/hq/cg5/cg5212/docs/LLPN.pdf. Greger Pacific, however, did not obtain a valid load line certificate (or either a trip permit or exemption letter) for either the

PAGE 4 – OPINION AND ORDER

Weeks 243 or the DB-560. The Coast Guard later penalized Greger Pacific for not doing so. In addition, Greger Pacific did not obtain insurance for either of the barges. This was allegedly in violation of the Towage Agreement, which further provided that if one party fails to obtain insurance or is in violation of its insurance policy, then that party is deemed to be an insurer (or self-insurer) and shall accept or pay claims that would have otherwise been submitted to the insurance company.

The Towage Agreement also contains a requirement disclosure provision. Paragraph 3(B) of the Towage Agreement provides in relevant part: "Customer [Greger Pacific] warrants that . . . it has informed Owner [Oregon Offshore] of any special circumstances or conditions applicable to the Tow or the cargo which may affect the Owner's performance of services under this agreement." Green Decl., Attachment 3, at 3. Greger Pacific did not provide copies to Oregon Offshore of the surveys prepared by Mr. Teicheira or any other information regarding the condition of either barge.

Oregon Offshore's tug, the Ocean Eagle, left Hawaii with the two barges in tow on September 4, 2012. The Ocean Eagle towed the two barges in a tandem formation, with the DB-560 in front and the Weeks 243 in back, at the instruction of Mr. White, the President of Oregon Offshore. In his deposition, Captain Dennis Cooley, the captain of the Ocean Eagle stated that this formation was incorrect and unsafe. Haglund Decl. ¶ 3, Ex. A at 8.

In addition, Captain Cooley inspected the barges with Mr. Greger before the voyage. Captain Cooley asked Mr. Greger if he had a "suitability for tow" survey performed or a load line certificate (or trip permit), and Mr. Greger said that he did not. This concerned Captain Cooley because, in his opinion and assumption, "the reason why [Greger] didn't get one, [was] because nobody would pass the barges. The Coast Guard wouldn't have let him—let us tow

PAGE 5 – OPINION AND ORDER

them." *Id.* at 11. Captain Cooley told Mr. White that Greger Pacific did not have a trip permit, and Mr. White told Captain Cooley to "just tow" the barges. *Id.* at 12.

On September 4, 2012, at approximately 6:00 p.m., the Ocean Eagle left Pearl Harbor with the Weeks 243 and the D-560 in tow. Less than 24 hours after leaving Pearl Harbor, however, and just 39 miles off the coast of Hawaii, the Weeks 243, which was the barge in back, began to sink. The Ocean Eagle log book notes that at approximately 2:40 p.m. on September 5, 2012, the crew discovered that the Weeks 243 was sinking. Captain Cooley inspected the Weeks 243, but believed it could not be saved. When attempting to disconnect the Weeks 243, the Ocean Eagle blew a hydraulic hose, rendering it inoperable. Fearing that the Weeks 243 would take both the DB-560 and the Ocean Eagle down with it, the crew cut the tow wire, leaving at least portions of the tow rigging from both barges attached to and submerged beneath the DB-560.

The U.S. Coast Guard classifies the sinking of a barge as a "Serious Marine Incident," which must be reported to the Coast Guard under federal law. 42 C.F.R. § 403-2(a)(4). Oregon Offshore, however, did not report the sinking of the Weeks 243, and later was assessed a substantial fine. Federal law also requires that after a Serious Marine Incident, each crew member involved must take a drug and alcohol test. 46 C.F.R. § 4.05-12. One month before the voyage, the Coast Guard, during an unscheduled inspection, verified that the required drug testing kits were on board the Ocean Eagle. Captain Cooley, however, states that the drug testing kits were no longer on board at the time of the sinking of the Weeks 243. Neither Captain Cooley nor anyone else affiliated with Oregon Offshore provided an explanation for why the drug testing kits were not on board. Captain Cooley also did not administer any alcohol tests, despite the fact that alcohol testing kits were on board. Although both of these tests are required by federal law

PAGE 6 – OPINION AND ORDER

to be administered after a Serious Marine Incident, Captain Cooley explained that he did not administer any alcohol tests because he "hadn't seen anybody drinking." Oregon Offshore and Captain Cooley were fined for these violations as well. Captain Cooley also has a personal history of drug and alcohol problems. In 2010, Captain Cooley received a one-year suspension of his captain's license for testing positive for cocaine while at work, and he was fired from his job at Hawaiian Tug & Barge for drug violations.

Captain Cooley spoke with Mr. White either during or shortly after the sinking of the Weeks 243. Mr. White instructed Captain Cooley to continue with the tow of the DB-560 to California. Captain Cooley claims that he called Mr. Greger after the Weeks 243 sank and that Mr. Greger also instructed Captain Cooley to continue towing the DB-560 to California. Mr. Greger disputes this fact and states that he never told Captain Cooley to continue towing the DB-560.

In order to continue the tow of the DB-560, the Ocean Eagle attached a "soft line," made of poly Dacron (a thick rope used for marine purposes) to the center of the bow of the DB-560. This soft line, unlike the original tow rigging, did not have a chain bridle, which distributes the force of the tow and weighs down the tow line, giving it "catenary" (a curved hanging shape), which acts as a shock absorber. Teicheira Decl. ¶ 13. The Ocean Eagle towed the DB-560 in this condition, averaging a speed of five knots, directly into the prevailing winds and sea. Haglund Decl. ¶ 4, Ex. C. The original tow rigging, composed of heavy chain bridles and about 300 feet of thick steel wire, continued to hang submerged under the DB-560. Plaintiff's expert, Mr. Teicheira, opines that two knots is the maximum speed that a prudent sailor would tow under these emergency tow conditions, and even then only to the nearest port. Teicheira Decl. ¶ 14.

Six days later, on September 11, 2012, Captain Cooley noticed the DB-560 was taking on water. Because of weather conditions, it was not until September 13, 2012, that the Ocean Eagle could come alongside the DB-560 to investigate. Between September 11 and September 13, the average speed of the Ocean Eagle was approximately four knots. On September 13, when the Ocean Eagle's crew members were able to board the DB-560 to investigate, they discovered a hole in the deck where an electrical box previously had been located. The crew also observed a crack in the deck of the DB-560. Neither the hole nor the crack was present when the barge left Pearl Harbor. Greger Decl. ¶ 10. Mr. Teicheira opines that the electrical box was likely knocked overboard due to the constant water coming over the bow of the DB-560, and the crack was caused by either the extreme force on the DB-560 when the Weeks 243 sank, or by the localized force exerted on the barge by the single-point emergency tow line. The crew attempted to pump water out of the hull of the DB-560, but was unable to save it. The DB-560 sank later that same day.

Oregon Offshore also failed to report to the Coast Guard the Serious Marine Incident of the sinking of the DB-560 and again failed to administer either drug or alcohol tests to the crew members of the Ocean Eagle. In addition, both Captain Cooley and Jerry White conceded that had the Ocean Eagle returned to Hawaii after the sinking of the Weeks 243, the DB-560 likely would have safely arrived.

## DISCUSSION

### A. Gross Negligence

Oregon Offshore argues that it is entitled to summary judgment on Greger Pacific's claim of gross negligence because: (1) Greger Pacific failed to provide the barges in a seaworthy condition at the commencement of the voyage; and (2) Greger Pacific failed to obtain insurance for the barges and therefore is deemed to self-insure the barges under the Towage Agreement.

PAGE 8 – OPINION AND ORDER

Greger Pacific responds: (1) there is an issue of fact as to whether the barges were in a seaworthy condition at the beginning of the tow; and (2) towers cannot validly contract out of their own liability for gross negligence and there is a disputed issue of fact regarding whether Oregon Offshore was grossly negligent. The Court addresses each argument in turn.

### 1. Duty of Seaworthiness and Duty of Prudent Navigation

"The owner of a tow is responsible for its seaworthiness, and the owner of the tug for its safe navigation."[4] *Marina Mgmt. Grp., Inc. v. Basic Towing, Inc.*, 64 F. App'x 532, 534 (6th Cir. 2003) (unpublished) (citation omitted). When "a barge in tow sinks in calm water for no immediately ascertainable cause . . . in the absence of proof that the barge was improperly handled, the vessel's sinking is presumed to be a direct result of her unseaworthiness." *King Fisher Marine Serv., Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1184 (5th Cir. 1984). A tug, however, has a duty to "exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." *Stevens v. The White City*, 285 U.S. 195, 202 (1932). Thus, there is a presumption of unseaworthiness when a barge sinks in "calm waters" with no evidence of improper behavior on the part of the tug, but this presumption may be rebutted when there is evidence that the tug failed to act with reasonable care and skill.

Additionally, a "tug cannot complain about a condition of unseaworthiness or other weakness that caused the loss if it knew of the condition and failed to use reasonable care under the circumstances. *King Fisher*, 724 F.2d at 1184. Further, "if the alleged unseaworthiness is so apparent that it would be negligent for the tow to attempt to proceed, it cannot disclaim responsibility for the loss." *Id.*

---

[4] In this case, the "tows," or the vessels being towed, are the two barges (the Weeks 243 and the DB-560). The tug is the Ocean Eagle.

## 2. The Insurance Provision and Gross Negligence

The law has "harmonized" the duties of the tow and the tug through burdens of proof. *Id.* The tow has the burden of proving that the tug acted negligently in order to rebut the presumption of unseaworthiness when a tow sinks in calm waters. Under ordinary circumstances, to withstand a motion for summary judgment when there is a presumption of unseaworthiness, it is sufficient for the owner of the tow to demonstrate that a question of fact exists as to whether the tug acted negligently. In the pending case, however, the tow owner's burden is heightened because the Towage Agreement required that any party that fails to obtain insurance for a vessel being towed will be responsible as a "self-insurer" for any claim that would have been submitted to the insurance company for that vessel.

Although the United States Supreme Court has held that exculpatory provisions in towing contracts that relieved towers of *all* liability are invalid *per se* as against public policy, *Bisso v. Inland Waterways Corp.*, 349 U.S. 85 (1955), the Ninth Circuit has interpreted *Bisso* to allow for the enforcement of an insurance provision that precludes a barge owner who failed to obtain insurance from recovering damages from the tower, at least under certain circumstances. *Dillingham Tug & Barge Corp. v. Collier Carbon & Chemical Corp.*, 707 F.2d 1086, 1089-90 (9th Cir. 1983). The Ninth Circuit has further stated, however, that a tug company cannot contract to avoid liability for its own gross negligence. *Royal Ins. Co. of Amer. v. Southwest Marine*, 194 F.3d 1009 (9th Cir. 1999).[5] As the Ninth Circuit explained, "a party to a maritime contract should not be permitted to shield itself contractually from liability for gross negligence." *Id.* at 1016. Thus, if Greger Pacific establishes the existence of a genuine dispute of material fact

---

[5] Gross negligence is "characterized by conscious indifference to or reckless disregard of the rights of others." *Garrison v. Pacific Northwest Bell*, 45 Or. App. 523, 532 (1980); *see generally Royal Ins. Co.*, 194 F.3d at 1015 (noting that courts look to state "common law in considering maritime torts").

concerning whether Oregon Offshore's conduct amounted to gross negligence, then Greger Pacific will survive summary judgment, notwithstanding the alleged breach by Greger Pacific of the insurance obligations contained in the Towing Agreement.

### 3. Disputes of Fact Concerning Seaworthiness and Gross Negligence

Viewing the evidence in the light most favorable to the nonmoving party, which is Greger Pacific, the delcarations submitted by Mr. Greger and Mr. Teicheira create an issue of fact for the jury concerning whether the two barges were seaworthy when the voyage commenced. Mr. Greger stated that based on his years of experience in the industry and his inspection of the barges, "both barges were seaworthy and capable of making the voyage from Hawaii to San Francisco." Greger Decl. ¶¶ 8, 9. Mr. Teicheira, Greger Pacific's expert witness, also stated that based on his inspection, he believed the DB-560 "was in adequate condition to be towed from Honolulu to San Francisco." Teicheira Decl. ¶ 19. Although there is some indication in the report that Mr. Teicheira found deck holes that should be sealed, he now states that there were no deck holes, but only "indentations" that did not affect seaworthiness. *Id.* Mr. Teicheira explains that he included a general repair recommendation in response to the indentations that referenced holes, but that he did not actually observe any holes on the DB-560. *Id.* This tension, even if rising to the level of an actual conflict between Mr. Teicheira's pre-incident report and his declaration, must be resolved by the fact-finder, who will make credibility determinations and weigh conflicting evidence.

Greger Pacific concedes that it did not obtain a load line certificate or trip permit from the Coast Guard and also that it did not obtain insurance for the barges. These issues, while probative of unseaworthiness, are not dispositive. *See generally South, Inc. v. Moran Towing & Transp. Co.*, 252 F. Supp. 500, 506 (S.D.N.Y 1965) (holding in the opposite context that a Coast Guard certificate "does not establish prima facie proof of seaworthiness and need only be

PAGE 11 – OPINION AND ORDER

considered in the factual context of the case"). Considering the declarations of Mr. Greger and Mr. Teicheira, there is a factual dispute concerning the seaworthiness of the two barges. In sum, although the failure to obtain a load line certificate or a trip permit and the failure to obtain insurance, as was contractually required, is probative of unseaworthiness, it is not dispositive of that question.

There is also a genuine dispute of material fact concerning whether Oregon Offshore was grossly negligent in towing the two barges. Several facts in the summary judgment record support this conclusion. First, there is the reasonable inference of possible drug or alcohol use by the crew of the Ocean Eagle. Despite the well-established and well-understood reporting requirements that are triggered after a Serious Marine Incident, Captain Cooley did not report to the Coast Guard the sinking of either the Weeks 243 or the DB-560. Moreover, the Captain did not administer the required drug or alcohol tests, claiming that the drug kits were not on board the Ocean Eagle (but unable to explain why the drug kits were found on board by the Coast Guard only a month before). Further, Captain Cooley's own history of work-related drug incidents may be evidence of a motive for not reporting the Serious Marine Incidents because, if there had been drug use involved, Captain Cooley could have feared a repeat, or worse, of the suspension or firing that he previously experienced. Second, Mr. Teicheira's declaration suggests that the Ocean Eagle was towing at a significantly higher speed than was appropriate for the circumstances of the tow. Teicheira Decl. ¶¶ 11-14.

Third, and specific to the DB-560, the Ocean Eagle crew left heavy towing rigging hanging from the DB-560 after the Weeks 243 sank. Mr. Teicheira opined that this rigging weighed the down the DB-560 and caused more water to hit the DB-560 and to come over its deck. Fourth, the Ocean Eagle towed the DB-560 with a temporary, emergency tow rigging. This

PAGE 12 – OPINION AND ORDER

rigging, which was essentially a thin marine rope, caused a more localized force on the DB-560 during the tow, which Mr. Teicheira suggests may have caused the crack in the deck of the DB-560. Fifth, the Ocean Eagle did not return to the closest port with the DB-560 after securing the emergency tow rigging. In the opinions of Captain Cooley and Mr. White, the DB-560 would have made it safely to port if it had been towed back to Pearl Harbor after the sinking of the Weeks 243. Mr. Teichiera also stated that the emergency tow line setup was adequate for towing the DB-560 back to Hawaii but not for towing all the way to California. Sixth and finally, Captain Cooley stated that it was unsafe to tow the Weeks 243 behind the DB-560.

These facts taken together and viewed in the light most favorable to the nonmoving party create an issue of fact concerning whether Oregon Offshore was grossly negligent in the towing of the two barges. If the fact-finder determines that Oregon Offshore was grossly negligent, the insurance provision of the Towage Agreement will not operate to allow Oregon Offshore to avoid liability. Thus, the Court denies Oregon Offshore's motion for summary judgment against Greger Pacific's claim concerning both barges.

**B.    Plaintiff is the Owner of the Claim Involving the Weeks 243 Barge**

Oregon Offshore argues that it is entitled to summary judgment against Greger Pacific's claim regarding the Weeks 243 barge because Greger Pacific is not the proper plaintiff to assert that claim. Although the Weeks 243 was originally owned by Greger Pacific Equipment, LLC (as opposed to the Plaintiff in this case, Greger Pacific Marine, Inc.), Mr. Greger states that Greger Equipment was dissolved in December of 2012 and all of its equipment and other assets were transferred to the Plaintiff, Greger Pacific. According to his declaration, Mr. Greger states that the assets that were transferred to Greger Pacific include the claim for damages against Oregon Offshore relating to the Weeks 243. If a proper assignment was made, then Plaintiff

would the proper owner of the claim regarding the Weeks 243. Thus, the Court denies Oregon Offshore's motion for summary judgment on this basis concerning the Weeks 243.

### C.  Towage Fee

Oregon Offshore also argues that it is entitled to summary judgment on its counterclaim for its towage fee. The Towage Agreement provides that the lump sum fee was "irrevocably earned . . . upon commencement of services," regardless of whether "the tug, tow, and/or cargoes" were "lost or not lost." Based on this language, Oregon Offshore insists that it is entitled to the towage fee upon commencement of the tow of the two barges and that it did not lose the right to this fee, even after the two barges sank.

Greger Pacific responds that that Ninth Circuit has upheld a district court's refusal to award a towage fee in the context of negligent actions on the part of the tower, despite an "earned on commencement" clause. *See Dillingham*, 707 F.2d 1086 (9th Cir. 1983). Specifically acknowledging the "earned on commencement" clause, the Ninth Circuit held that when there is "ample evidence to support the trial court's finding that [the tow] breached the implied warranty to perform the tow in a workmanlike manner," a trial court is "correct in refusing to allow [the tow] to collect its towing fees . . . ." *Id.* at 1091-92; *see also Koch Ref. Co. v. Jennifer L. Boudreaux M/V*, 85 F.3d 1178 (5th Cir. 1996) (holding that a district court correctly determined that the towing company was not entitled to recover towage fees when the loss of tow was due in part to the towing company's negligence).

For the reasons discussed above, there are issues of fact concerning whether Oregon Offshore was negligent, grossly negligent, or neither. Thus, the Court denies Oregon Offshore's motion for summary judgment on its counterclaim for towage fees.

PAGE 14 – OPINION AND ORDER

**D. Evidentiary Objections**

In Oregon Offshore's reply brief, it objects to the following evidence submitted by Greger Pacific: (1) references to the content of the Coast Guard Investigative Report; (2) recorded statements of Oregon Offshore's employee Perry Hilleary taken by Mr. Teicheira; (3) portions of Mr. Teicheira's declaration not based on personal knowledge; (4) references to any history of Captain Cooley's drug or alcohol use; and (5) any advice that Mr. Greger may have received from his accountant. Oregon Offshore argues that the Coast Guard report is inadmissible under 46 U.S.C. § 6308,[6] and that the Perry Hilleary statements and the advice from the accountant are inadmissible hearsay. Oregon Offshore further argues that Greger Pacific's counsel previously stated that Mr. Teicheira would be Plaintiff's expert witness on damages and valuation issues. Based on this representation, Defendant argues, Mr. Teicheira may not testify as an expert witness on liability issues, and thus his testimony on issues other than damages or valuation must be limited to factual matters about which he has personal knowledge. Defendant also argues that Mr. Teicheira is not qualified to opine on liability issues. Finally, Oregon Offshore objects that Captain Cooley's personal drug and alcohol history is irrelevant.

Greger Pacific responds first that the Coast Guard Investigative Report may be considered on summary judgment because, even if the report itself would be inadmissible at trial, the contents of the report will be properly admitted into evidence in a number of ways, including testimony from witnesses. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (holding that "[at] the summary judgment stage, we do not focus on the admissibility of the evidence's

---

[6] This statute provides, in relevant part: "Notwithstanding any other provision of law, no part of a report of a marine casualty investigation conducted under section 6301 of this title, including findings of fact, opinions, recommendations, deliberations, or conclusions, shall be admissible as evidence or subject to discovery in any civil or administrative proceedings, other than an administrative proceeding initiated by the United States." 46 U.S.C. § 6308(a).

PAGE 15 – OPINION AND ORDER

form," but "instead focus on the admissibility of its contents"). Greger Pacific states that it will present the information contained in the contents of the report through direct testimony, expert testimony, and impeachment of witnesses. Based on Plaintiff's representative, the Court overrules Oregon Offshore's objection to the report.

Next, Perry Hilleary's statements are admissible under Rule 801(d)(2)(D) as a statement made by a party opponent, as Mr. Hilleary's statements were "made by [Oregon Offshore's] employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). Mr. Teicheira took Mr. Hilleary's statement five days after the Ocean Eagle returned to Coos Bay after the sinking of the two barges. Mr. Hilleary was a mate on the Ocean Eagle during the voyage at issue in this case. The Court overrules Oregon Offshore's objection to Mr. Hilleary's statements.

In addition, according to Plaintiff's counsel, Mr. Teicheira is both a fact witness and Greger Pacific's expert witness on both liability and damage issues.[7] As such, Mr. Teicheira is permitted to give his opinion evidence under Rules 702 and 703. At the summary judgment phase, "where an expert is not obviously unqualified, questions . . . as to the expert's qualifications should rarely be resolved by exclusion of the evidence." *California Steel and Tube v. Kaiser Steel Corp.*, 650 F.2d 1001, 1003 (9th Cir. 1981); *see also City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1043-44 (9th Cir. 2014). If Oregon Offshore wishes to challenge Mr. Teicheira's expert qualifications, Oregon Offshore may present a specific and separate objection to Mr. Teicheira's "knowledge, skill, experience, training, or education." Fed.

---

[7] The parties agreed to postpone their expert discovery until after this summary judgment motion was filed and decided and, accordingly, have not yet exchanged expert reports. This may partially explain Defendant's misunderstanding concerning of Mr. Teicheira's precise role in this case as an expert witness retained by Plaintiff.

R. Evid. 702. At this stage of the proceeding, however, Oregon Offshore's general objection regarding Mr. Teicheira's testimony is overruled.

Further, the references to Captain Cooley's drug and alcohol use may be admissible as evidence of motive under Fed. R. Evid. 404(b)(2). Captain Cooley's past work related problems regarding drug or alcohol use, coupled with his awareness that a positive test could again result in suspension or loss of his job, may provide a motive for not reporting the two relevant Major Marine Incidents to the Coast Guard. This objection is overruled.

Finally, any advice that Mr. Greger may have received from his accountant is not being offered for the truth of the matter asserted, *i.e.*, the underlying advice. Instead it is being offered for its effect on the listener, providing an explanation for why Mr. Greger did what he did. This objection is overruled.

## CONCLUSION

Defendant Oregon Offshore Towing, Inc.'s Motion for Summary Judgment (Dkt. 19) is DENIED.

**IT IS SO ORDERED**.

DATED this 10th day of July, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge